UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLLEEN STEWART,<br><br>        Plaintiff,<br><br>    v.<br><br>PROPERTY AND CASUALTY INSURANCE CO. OF HARTFORD,<br><br>        Defendant. | No.  2:17-cv-2418-TLN-KJN PS<br><br>FINDINGS AND RECOMMENDATIONS ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>(ECF Nos. 61, 69, 73.) |

Plaintiff Colleen Stewart alleges three insurance-styled claims concerning damage to her South Lake Tahoe residence. (ECF No. 1.) Defendant Property and Casualty Insurance Company of Hartford now moves for summary judgment, and Stewart opposes.[1] (ECF Nos. 61, 69.) In addition to the dispositive motion, Hartford objects to some of Stewart's evidence submitted with her opposition brief. (See ECF No. 73.) Further, Stewart submitted eight additional filings related to her opposition, after the deadline expired; the filings vary in subject matter, but mainly relate to Stewart's request to submit more photos in support of her opposition (as well as the handling of these photos in discovery). (ECF Nos. 76, 78, 80, 81, 82, 83, 84, 85.)

The undersigned recommends summary judgment be issued in favor of defendant.

---

[1] Defendant's motion is referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302(c)(21) for the entry of findings and recommendations. See Local Rule 304. The motion was submitted for decision upon the record and written briefing, and without the need for oral argument, pursuant to Local Rule 230(g). (ECF No. 47.)

1

**BACKGROUND**

Stewart maintained a Hartford insurance policy covering her South Lake Tahoe residence when, in the fall of 2016, the downstairs ceiling suffered water damage. Stewart reported the damage to Hartford in December of 2016, and her report included an allegation that the entire residence was contaminated with asbestos. Hartford hired three companies to inspect the residence in January 2017. The asbestos inspector recommended minor abatement of the popcorn ceiling, which contained asbestos, and Hartford offered Stewart just over $500 for repairs (based on the lower estimate). Stewart expressed to Hartford concerns about asbestos air contamination and contamination of her upstairs rooms. The asbestos inspector returned to test the air quality and upstairs, but found no fibers upstairs and found the air quality "well below acceptable levels." Nonetheless, Hartford increased its offer to over $8,000, based on the higher repair estimate. Between February and April, the parties continued to exchange emails, ending with Stewart retaining counsel and rejecting Hartford's offers. Stewart then hired her own asbestos inspector, but this company's findings were similar to Hartford's three companies. Stewart's inspector submitted a repair estimate of just under $10,000, and Hartford agreed to pay this increased sum. However, Stewart declined this offer too, and filed the instant case in California Superior Court. Hartford removed to this court a month later, and the parties proceed with discovery.

In the summer of 2018, Hartford hired an expert to collect dust and air-quality samples in the residence. The expert found 0% asbestos in the air, and recommended minor abatement and clean up. Stewart also retained three more companies to inspect the residence around this time. Two of those companies found no asbestos contamination, and one agreed with the $8,000 clean-up costs. A third company tested debris which Stewart collected herself from her bedroom; the tests showed asbestos. This company did its own inspection later, and found asbestos debris "throughout" the residence, though no air contamination. The representative from this third company admitted in deposition that the conditions of the residence could change in a year-and-a-half, and that the company could not verify the authenticity of the sample collected by Stewart.

During the pendency of the case, the undersigned resolved multiple discovery disputes concerning an inspection of the residence, Stewart's deposition, and Stewart's production of

documents and damages calculations. In April 2019, Stewart's counsel moved to withdraw. The district court granted counsel's motion in March 2020, then referred the case to the undersigned under Local Rule 302(c)(21). On June 19, 2020, Hartford filed its motion for summary judgment. Stewart failed to respond, but was granted an additional month to do so. After she filed her opposition (labeled a "cross-motion"), Hartford submitted a reply brief, and also objected to certain of Stewart's exhibits attached to her opposition brief. The court granted Stewart until October 16 to respond to Hartford's objections, and took the matter under submission. Between October 7 and November 4, Stewart filed eight separate documents related to this matter.

## DISCUSSION

Stewart's complaint alleges a claim for "breach of contract-duty to indemnify" (alongside a request for declaratory relief concerning the scope of the insurance policy) and a claim for "bad faith breach of the insurer's duty of good faith and fair dealing." (ECF No. 1.) Hartford contends no genuine issue exists as to the material facts of Stewart's breach of contract claim, necessitating summary judgment thereon. Hartford further argues that without a breach of contract claim, Stewart's good faith and fair dealing claim fails. (ECF No. 61.) Stewart opposes. (ECF No. 69.)

### Legal Standards for Summary Judgment

Federal Rule of Civil Procedure 56(a) allows for a party to move for summary judgment by "identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Summary judgment (i.e. judgment as a matter of law) is proper when the movant demonstrates that no genuine issue exists as to the material facts of the claim. Id. A dispute is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Freecycle Sunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A fact is "material" if it might affect the outcome of the suit under the governing law. United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009). A shifting burden of proof governs motions for summary judgment. Nursing Home Pension Fund, Local 144 v. Oracle Corp., 627 F.3d 376, 387 (9th Cir. 2010).

Initially, the party seeking summary judgment bears the burden identifying the legal basis for its motion and the portions of the declarations, pleadings, and discovery that support its

3

1  position. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (citing Celotex
2  Corp. v. Catrett, 477 U.S. 317, 323 (1986)). In claims where the moving party will not bear the
3  burden of proof on an issue at trial, the movant may prevail by "merely by pointing out that there
4  is an absence of evidence to support the nonmoving party's case." Id. If a moving party fails to
5  carry its burden at this step, then the opposing party "has no obligation to produce anything, even
6  if the non-moving party would have the ultimate burden of persuasion." Nissan Fire & Marine
7  Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000) (citing Adickes v. S.H. Kress &
8  Co., 398 U.S. 144, 160 (1970)).

9       If the moving party meets this initial burden, the opposing party must then establish that a
10 genuine issue as to any material fact actually exists. Matsushita Elec. Indus. Co., Ltd. v. Zenith
11 Radio Corp., 475 U.S. 574, 586 (1986). A genuine dispute of material fact can be demonstrated
12 by "(A) citing to particular parts of materials in the record, including depositions, documents,
13 electronically stored information, affidavits or declarations, stipulations . . . , admissions,
14 interrogatory answers, or other materials; or (B) showing that the materials cited do not establish
15 the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible
16 evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B); see also Estate of Tucker v.
17 Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008) ("The opposing party cannot rest upon
18 the mere allegations or denials of its pleading, but must instead produce evidence that sets forth
19 specific facts showing there is a genuine issue for trial.").

20      The parties are obliged to identify material facts, and the court is not required to scour the
21 record in search of a genuine disputed material fact. Simmons v. Navajo Cnty., 609 F.3d 1011,
22 1017 (9th Cir. 2010); see also Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited
23 materials, but it may consider other materials in the record."). In resolving a motion for summary
24 judgment, the evidence of the opposing party is to be believed, and all justifiable inferences that
25 may be drawn from the facts before the court must be drawn in favor of the opposing party.
26 Anderson, 477 U.S. at 255. While a "justifiable inference" need not be the most likely or the
27 most persuasive inference, it must still be rational or reasonable. Id. Further, a motion for
28 summary judgment may not rely on "the mere existence of a scintilla of evidence" (Anderson,

1  477 U.S. at 253); evidence that is "'merely colorable' or 'is not significantly probative"
2  (Anderson, 477 U.S. at 249-50); "some metaphysical doubt as to the material facts" (Matsushita,
3  475 U.S. at 586); or a party's "conclusory statement [regarding] a genuine issue of material fact,
4  without evidentiary support[.]" (Bryant v. Adventist Health Sys./W., 289 F.3d 1162, 1167 (9th
5  Cir. 2002)).  Moreover, "[a] party may object that the material cited to support or dispute a fact
6  cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).

Fundamentally, summary judgment may not be granted "where divergent ultimate inferences may reasonably be drawn from the undisputed facts."  Fresno Motors, LLC v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2015).

**Analysis**

When interpreting insurance policies, a court sitting in diversity applies the substantive law of the state in which it sits.  See Aetna Cas. & Sur. Co., Inc. v. Centennial Ins. Co., 838 F.2d 346, 350 (9th Cir. 1988).  Under California law, the elements of a breach of contract claim in an insurance-coverage dispute are:  (1) the existence of a policy, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) resulting damages to the plaintiff. See Oasis W. Realty, LLC v. Goldman, 51 Cal. 4th 811, 821 (2011)); see also Reichert v. General Insurance Co., 68 Cal. 2d 822, 830 (Cal. 1968) (equating insurance coverage claims with the standard elements of a claim for breach of contract).  "[U]nreasonable delay in paying policy benefits due "is an actionable withholding of benefits which may constitute a breach of contract as well as bad faith giving rise to damages in tort."  Intergulf Dev. LLC v. Super. Ct., 183 Cal. App. 4th 16, 20.  "The burden is on an insured to establish that the occurrence forming the basis of its claim is within the basic scope of insurance coverage."  Aydin Corp. v. First State Ins. Co., 18 Cal. 4th 1183, 1188 (1998); see also Anthem Elecs., Inc. v. Pac. Employers Ins. Co., 302 F.3d 1049, 1059 (9th Cir. 2002) (noting "the general burden of proving coverage [is] borne by the insured").

Here, the parties do not dispute that Stewart had a Hartford policy in effect at the time her South Lake Tahoe residence suffered water damage in October 2016, nor that Stewart reported potential asbestos contamination to Hartford in December 2016.  (ECF No. 61-3 at 6; Id. at Ex.

1   A-B; ECF No. 69 at 10-11.)  Further, it appears undisputed that in January of 2017, Hartford

2   hired three separate companies to both examine the residence for asbestos contamination and

3   provide estimates for restoration and repairs.  (ECF No. 61-3 at 9 (decl. Glover), 12-13 (decl.

4   Goshow), 16 (decl. King); Id. at Ex. E, F, G; ECF No. 61-4 at Ex. K, L; ECF No. 69 at 3 (pl. brief

5   describing events of Jan 2017).)  Instead, the dispute in this case concerns the rigors of the

6   asbestos testing performed, and Hartford's refusal to accede to Stewart's monetary demands of

7   over $100,000 (i.e., whether Hartford breached its obligations under the policy, whether Stewart

8   fully performed her obligations under the policy, and whether the alleged breach resulted in

9   Stewart's claimed damages).  Oasis W. Realty, 51 Cal. 4th at 821.

10   **A.   Hartford identifies portions of the record favoring summary judgment.**

11   In support of its position, Hartford identifies numerous declarations and exhibits

12   concerning the company's initial investigation of the damage.  In early January 2017, an

13   investigator for Environmental Testing and Consulting, Inc. ("ETC") found asbestos-containing

14   material in the popcorn ceiling, but no contamination of the property otherwise, and

15   recommended abatement prior to renovation/repair "if the materials will be disturbed by the

16   intended renovation."  (ECF No. 61-3 at 13 ¶ 4 (decl. Goshow); Id. at Ex. E.)  Allcat Claim

17   Service, L.P. submitted a repair estimate of $1,538.04, which included sealing of the ceiling tiles

18   and general cleaning of the residence.  (Id. at 16 ¶ 3 (decl. Glover); Id. at Ex. G.)  Additionally, 1-

19   888-4-Abatement, Inc. submitted a repair estimate of $8,124.28, which included "[scraping] the

20   acoustic ceiling texture in the living room, dining room, entry, and lower stair ceilings" and

21   general cleaning.  (Id. at 9 ¶ 3; ECF No. 61-4 at Ex. K.)  Based on these companies' findings,

22   Hartford offered Stewart just over $500 for repairs, which accounted for the Allcat estimate less

23   Stewart's $1,000 deductible.  (ECF No. 61-3 at Ex. D CF0012.)  After Stewart declined the offer

24   and expressed to Hartford concerns about the air quality in the residence, ETC returned to the

25   residence to test the air quality.  (ECF No. 61-3 at 13 ¶ 5.)  ETC found that "asbestos levels in the

26   samples taken were well below acceptable levels" for K-12 schools.  (Id.)  Nonetheless, Hartford

27   increased its offer to $8,124.28, based on the 1-888-4-Abatement estimate.  (Id. at Ex. D

28   CF0006.)  Between February and April, the parties continued to exchange emails, ending with

Stewart retaining counsel and rejecting Hartford's offers.[2] (ECF No. 61-4 at Ex. M, N, O, P.)

Hartford further supports its position by citing to the companies hired by Stewart herself. Following Stewart's rejection of Hartford's initial offers, she retained Select Environmental, Inc. ("Select") in the summer of 2017 to inspect the residence and provide reports on the potential asbestos contamination and remediation costs. (ECF No. 61-4 at Ex. EE.) Select submitted an estimate of $9,805.67, which included removal of all acoustic ceiling tiles in the entryway, dining room, office, master bedroom, and garage. (Id.) Select's representative agreed in his deposition that he did not believe it was "necessary or required that the whole house be gutted and start fresh." (Id. at Ex. X, 51:10-12.) Stewart's then-counsel submitted Select's estimate to Hartford, and Hartford agreed to pay Stewart $9,805.67. (Id. at Ex. R.) However, Stewart did not accept Hartford's newest offer, and instead filed her claims in California Superior Court. (See ECF No. 1.)

Thereafter, Stewart retained both NAL Environmental Testing & Consulting, Inc. and A-1 Remediation, to inspect the residence. NAL found "no [asbestos-containing material] present" in the areas it inspected. (ECF No. 61-4 at Ex. Z.) NAL recommended removal of "soft goods and electronics" near the water leaks, cleaning of "hard goods," and removal of debris in the living room, dining room, stairwell, entry, downstairs bedroom, laundry room, and garage storage room. (Id. at 101-02.) The representative from NAL agreed in his deposition that once the water leaks were repaired, the popcorn ceiling could be painted without further need for remediation. (ECF No. 61-3 at Ex. J 44:21-45:2.) The NAL representative agreed that the $8,124.28 estimate from 1-888-4-Abatement "look[ed] good." (Id. at 103:11-16.) Similarly, the representative from A-1 opined in his deposition that he did not "think the house was contaminated . . . , [that] it was very minor, very—just a very small amount that had fallen down, and I doubt if there was any exposure." (Id. at Ex. H 71:22-72:1.)

---

[2] In these emails, Stewart also alleged that her fingernails were peeling off because of asbestos, referenced issues with her condominium in Idaho, informed Hartford she would be hiring her own abatement company, believed it "would be illegal to hire [an abatement company because of] asbestos and lead readings," stated she had hired an attorney and would be filing a case, and accused Hartford of interfering with her home computer and "control[ling] the whole Internet service." (ECF No. 61-4 at Ex. M, N, O, P.)

Finally, Hartford cites to the declaration and report of its own expert, Wise Consulting & Training Company, an "environmental and industrial hygiene consulting and training firm." (ECF No. 61-3 at 21 ¶ 2 (decl. Wise).) Wise inspected the residence in July 2018, collecting multiple dust samples "as directed by [] Stewart, including [from the] carpet and personal property in the room where water damage to the acoustic [] ceiling had reportedly occurred in 2016," as well as from the "top of the stairs, and . . . from the acoustic ceiling on the wood burning stove and hearth in the property's living room." (Id. at ¶ 5.) Wise also collected a "personal air sample on [his] personal breathing zone throughout the inspection period[.]" (Id.) Wise sent the samples to San Air Technologies Laboratory for asbestos testing; the breathing sample indicated 0% asbestos, as did all but one of the dust samples. (Id.; see also ECF No. 61-4 at Ex. U, V.) The one sample that did contain asbestos came from a wood-burning stove and hearth, which Wise believed could be "easily cleaned and disposed of by conducting clean-up" of the residence. (ECF No. 61-3 at 22 ¶ 5.) Wise returned to the residence in December 2018 to collect additional samples from the upstairs bedrooms and master bathroom, and collected another personal air sample; none of these samples contained asbestos fibers. (Id. at 23 ¶ 6; see also ECF No. 61-4 at Ex. W, X.) Wise ultimately opined that the residence "does not contain hazardous levels of asbestos, and that any affected [materials] can be remediated through a simple cleaning of the affected areas [costing] no more than $6,000[.]" (ECF No. 61-3 at 23 ¶ 7.)

Stewart attempts to challenge this evidence in her opposition briefing. (ECF No. 69 at 2-7.) In brief, Stewart argues:

- The testing methodologies used by the various inspectors were faulty, including that "no asbestos surface samples [were] taken at the beginning of the claim only a ceiling sample showed 10% asbestos." (Id. at 2.)
- Hartford's inspector Greg Jackson took pictures, gave a low estimate, and made insufficient findings, including that he failed to pull out the fridge to check for water damage. (Id. at 3.) Throughout the events, Hartford indicated Stewart's concerns were negligible: that she was told to "just vacuum it up," that "asbestos takes 20 years to kill you," that the residence was "habitable," and that she should cash the check for $524. (Id. at 4.)
- Karl Glover (of 1-888-4-Abatement) told Stewart "everything needs to be thrown away because of asbestos damage," and told Hartford to close the claim before ETC performed an air test. (Id. at 3.)

8

- Bob Nemitz (of ETC) did not take air samples, and only tested dry ceiling, not the wet and damaged ceiling. Nemitz should have tested walls deeper because Stewart painted over the walls. (Id. at 3.) ETC did not conduct air samples for 2 full hours, and the report only showed asbestos in the ceiling but did not report on two other samples. (Id. at 4.) Nemitz is not certified to test for asbestos, only lead. (Id. at 5.)
- Wise took an "illegal 3 tube air test" 100 days after the storm, when the air had "settled (should be done after renovation)". Wise did not tell Stewart he was coming to her house on the day he conducted the tests. (Id. at 4.)
- Terri McFarlane (of Benchmark) was "not qualified to suggest how to paint a disintegrating ceiling with water damage containing brown asbestos water marks." (Id. at 4.)

Stewart's arguments, unsupported by any evidence, do not suffice to counter Hartford's initial showing.[3] Stewart is not an asbestos expert, and points to no documents showing she deposed any of the individuals above or challenged their qualifications by some evidentiary means. Stewart cannot make statements on behalf other individuals, as this is hearsay. And even if Hartford's initial offer of $500 could be considered low, the company very quickly offered Stewart $8,000, then almost $10,000 after Stewart submitted her own estimate from Select in the summer of 2017. Stewart's challenges amount to nothing more than conclusory statements and "metaphysical doubt[s]" about Hartford's material facts; the court cannot rely on such averments when resolving a summary judgment motion. Matsushita, 475 U.S. at 586 (party cannot rely on "some metaphysical doubt as to the material facts"); Bryant, 289 F.3d at 1167 (party cannot rely on "conclusory statement[s] [regarding] a genuine issue of material fact, without evidentiary support[.]").

Through the above evidence, Hartford has met its initial burden to identify "the legal basis for its motion" and "portions of the declarations, pleadings, and discovery that support its position." Soremekun, Inc., 509 F.3d at 984. The burden now shifts to Stewart to demonstrate "that a genuine issue as to any material fact actually exists." Matsushita, 475 U.S. at 586.

---

[3] Hartford objected to much of Stewart's declaration and proffered evidence. (See ECF No. 73.); see also Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Because the court is attempting to construe Stewart's arguments in her favor, it has condensed much of her opposition brief in the bullet points above. To this end, the court will not address Hartford's objections on a point-by-point basis—even though the court finds most (if not all) objections well taken.

**B.     Stewart's attempt to demonstrate a genuine issue of material fact fails.**

Construing Stewart's argument liberally, she appears to assert that because certain evidence shows extreme asbestos contamination, Hartford breached its duty to remediate and repair the residence, resulting in damages higher than the $500-$9,000 previously offered.[4] (ECF No. 69.) To support her arguments, Stewart cites to these four main categories of documents:

- A May 2018 report from Benchmark Environmental Engineering, an environmental testing and inspection company hired by Stewart. (See ECF No. 69 at 4; Id. at 39-40.) Stewart mailed a sample of some debris from her master bedroom to Benchmark; a test of the debris showed 10% asbestos. (See Id.)
- A July 2018 report from Benchmark after the company conducted on-site testing. (Id. at 14-18.) The tests indicated asbestos debris located "throughout" the residence. (Id.)
- A bid from A-1 Remediation for $63,749.00, which covers remediation, cleaning, and restoration of the residence. (Id. at 7; Id. at 114.)
- Numerous pictures of her home—taken both by herself and by the various companies involved in this dispute. (See Id. at 2; Id. at 22-29; 61-93; 87-92.)

Stewart's evidence is problematic, to say the least, and does not allow the court to draw justifiable inferences in her favor. Anderson, 477 U.S. at 255 ("While a 'justifiable inference' need not be the most likely or the most persuasive inference, it must still be rational or reasonable.").

Regarding the sample tested by Benchmark in May 2018, as well as Benchmark's in-person inspections in July 2018, the court sees two issues. First, Benchmark's report appears to corroborate much of what the other inspectors reported in January 2017—that the popcorn ceiling contained asbestos, that a portion of the ceiling in the downstairs area sustained water damage, and that a large portion of the downstairs surface needed cleaning. (ECF No. 69 at 14-18.) Benchmark noted no acoustical material in the ceiling area of any of the upstairs rooms, and noted no issues with air contamination during their inspections. (See id. at 15; ECF No. 61-3 at 199: 7-10 (Benchmark depo.) ("Q: [I]n Benchmark's opinion was there any air issue at this residence? A: Not at the time of that inspection.")

---

[4] Throughout her brief, Stewart references a condominium in Idaho, her status as a single senior citizen with an epilepsy disability, Hartford's cancellation of her policy two years later due to mold damage, her inability to obtain new insurance due to her pending claim, the context of her deposition by Hartford, her conversations with her former attorney, and counsel's withdrawal in April 2019. (ECF No. 69 at 2-7.) These issues are irrelevant to Stewart's claims and Hartford's summary judgment motion, and so will not be discussed further. Fed. R. Evid. 401.

Second, as Benchmark (and others) noted in deposition, there is no way for Benchmark inspectors to know in 2018 what the status of the residence was when Stewart first contacted Hartford in late 2016.  (See ECF No. 61-3 at 198:3-8 (Benchmark depo.) ("Q: [S]o now Benchmark is getting involved in the inspections in June of 2018. Would you expect the site conditions to have changed between when the leak had originally occurred and a year and eight months later? A: Typically, I would, yes."); Id. at 217:5-8 and 218:4-6  (NAL depo.) ("A: I'm only basing everything I'm saying based on the time that I was there. So I have no prior knowledge to what happened prior to or what it was doing.  Q: You don't know what water damage existed at the property in January of 2017? A: Correct."); Id. at 191:17-24 (A-1 depo.) ("Q: [T]he storm that supposedly caused this was in October of 2016; so you're there almost a year later? A: Yeah, I guess. Q: What you are seeing could have been distinctly different than what the consultants who were in there January 2017 saw? A: Correct."); ECF No. 61-4 at 97:6-11 (Select depo.) (Q: "Would you agree that someone who's – has the opportunity to be there in early January is able to observe conditions that more closely resembled those which existed right after the alleged water intrusion than you would be able to in July of 2017? A: I would sure think so.").)  Thus, the court cannot draw a justifiable inference of more-extreme contamination based on Benchmark's 2018 reports.[5]  Anderson, 477 U.S. at 255 ("While a 'justifiable inference' need not be the most likely or the most persuasive inference, it must still be rational or reasonable."); Intergulf, 183 Cal. App. 4th at 20 (breach of contract claim for delays in payment actionable if delay is "unreasonable"); Cal. Civ. Code § 1657 (reasonable time allowed).

---

[5] Additionally, Benchmark's first test was conducted on a sample collected by Stewart herself over a year and a half after the October 2016 storm.  (See ECF No. 69 at 41, Stewart's handwritten note to Benchmark describing how the sample was collected.)  As Benchmark's representative noted in his deposition, the company "really doesn't know anything about the circumstances of how and when the sample was taken" other than what Stewart stated.  (ECF No. 61-3 at 197:1-5.)  Benchmark told Stewart as much when it provided her with the test results.  (ECF No. 69 at 39.)  The representative for NAL—a company hired by Stewart—noted that without proper protocols in place, the sample would be suspect.  (See ECF No. 61-3 at 213:17-24; see also ECF No. 61-4 at 96:1-9 (Select depo.) ("Q: If a homeowner takes the samples, the only way you really know where they came from is the homeowner's word, right?  A: Correct  Q: Whereas, in—with a professional, they have a chain of custody document that says where they took the sample . . . etc.? A: Yes.").)

11

As to the March 2020 bid by A-1 to remediate and clean the residence (ECF No. 69 at 113-15), the court concurs with Hartford's objection (ECF No. 73 at 11-12) that this is not affirmative evidence of asbestos contamination—especially air contamination. Rather, it is simply an estimate to clean the residence and scrape the acoustic ceiling, each of which Hartford offered to pay for in 2017. As such, this bid does not create a genuine issue of material fact as to whether Hartford breached the policy in 2017 by refusing to accede to Stewart's demands based on her belief that her entire residence was contaminated. Kapp, 564 F.3d at 1114 ("A fact is 'material' if it might affect the outcome of the suit under the governing law.").

Similarly, the photographs that litter plaintiff's filings with this court (ECF No. 69 at 22-29, 61-93, 94-99; ECF No. 84 at 6-38) only show what they show: a residence that sustained damage after a rainstorm. The pictures do not show (nor can they) that the residence was contaminated with asbestos—including the core of Stewart's complaint that the air was filled with asbestos fibers. Freecycle Sunnyvale, 626 F.3d at 514 ("A dispute is 'genuine' if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party."). Stewart asserts in her opposition brief that these pictures "show and prove the facts on asbestos and water damage" on the ceiling, surfaces, floors, and drywall. (ECF No. 69 at 2.) Statements such as this are conclusory and cannot be relied upon to support Stewart's position in summary judgment. Bryant, 289 F.3d at 1167 (noting that a party cannot rely on a "conclusory statement [regarding] a genuine issue of material fact"); see also, e.g., Stephens v. Union Pac. R.R. Co., 935 F.3d 852, 857 (9th Cir. 2019) (affirming district court's rejection of evidentiary opinion regarding plaintiff's exposure to asbestos where the opinion was "not based on facts or data").

Reviewing the remainder of the record cited by Stewart, the court finds the evidence in conformity with Hartford's position: that it has not breached its duty under the policy to repair the residence after the October 2016 storm, and did not act in bad faith throughout the proceedings. Stewart's arguments are nothing more than speculation and wild conjecture, and cannot support her claim for breach of contract or for a declaratory judgment. Aydin, 18 Cal. 4th at 1188 ("The burden is on an insured to establish that the occurrence forming the basis of its claim is within the basic scope of insurance coverage."). Further, since these claims fail,

Stewart's claim for breach of duty of good faith and fair dealing also fails. <u>Lunsford v. American Guarantee & Liability Ins. Co.</u>, 18 F.3d 653, 656 (9th Cir. 1994) ("[A] court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue as to the insurer's liability. An insurer is liable for breach of the implied covenant of good faith and fair dealing if it acted unreasonably in denying coverage."). Because Stewart has the burden of proof on her claims, Hartford only need point out the absence of evidence supporting Stewart's case. <u>Soremekun</u>, 509 F.3d at 984. Hartford does so. (ECF No. 61-2 at ¶ 7.) Thus, summary judgment should issue in Hartford's favor.

## **RECOMMENDATIONS**

Accordingly, it is hereby RECOMMENDED that:

1. Defendant's motion for summary judgment (ECF No. 61) be GRANTED IN FULL;
2. Judgment be entered for defendant; and
3. The Clerk of Court be directed to CLOSE this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen (14) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served on all parties and filed with the court within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

Dated: January 21, 2021

_Kendall J. Newman_
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

stew.2418